FILED
2004 MAR 29 PM 4:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| CANDACE PLANK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CV 01-B-3335-NE |
| ) | |
| PREVENTATIVE & REHABIL- ) | |
| ITATIVE SPORTS MEDICINE ) | ENTERED |
| ASSOCIATES, INC., ) | MAR 29 2004 |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This case is presently before the court on defendant's Motion for Summary Judgment. (Doc. 22.) Plaintiff Candace Plank has sued her former employer, Preventative & Rehabilitative Sports Medicine Associates, Inc. [hereinafter "PRSM"], alleging that defendant discriminated against her on the basis of her pregnancy in violation of federal law. Plaintiff also alleges state-law causes of action for invasion of privacy and breach of contract. Upon consideration of the record, the submission of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 22), is due to be granted.

### I. STANDARD OF REVIEW

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the

initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every **reasonable** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. STATEMENT OF FACTS[1]

Defendant is a small corporation with less than 30 employees. (Doc. 23, Ex. B at 146-47.) Defendant is owned by Mark Noble, President, and Brian Williams, Director of Physical Therapy. (*Id.* at 29; Ex. D at 10-11; Ex. E at 9.) In 1997, defendant's revenue was generated by the operation of a fitness center and a physical therapy center. (*Id.*, Ex. B at 27-28.)

Defendant hired plaintiff in December 1997 as an Insurance Collections Clerk. (*Id.*, Ex. A at 12, 15.) Teresa Noble, defendant's Chief Operating Officer and wife of Mark Nobles, hired plaintiff and was her supervisor. (*Id.* at 18; Ex. A at 13, 22.) Plaintiff was responsible for billing and collecting payments for physical therapy services from insurance companies. (*Id.*, Ex. A at 15; Ex. B at 59-60.) Later, plaintiff also became responsible for the patient billing for physical therapy services, and she started dealing with the attorney defendant used for collections. (Doc. 25, Ex. A at 26.)

Plaintiff received very high reviews, evaluations, and compliments from Ms. Noble throughout her employment. (*Id.* at 28, 29; Ex. B at 1.) Plaintiff and Ms. Noble became friends and often had lunch together. (Doc. 23, Ex. A at 37, 48, 55.)

---

[1] The facts are set forth herein in the light most favorable to the plaintiff, the non-moving party. *See e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000). "'Thus, what [the court] state[s] as "facts" in this opinion for purposes of . . . ruling[ ] on the summary judgment motions' are 'the facts for present purposes,' but they 'may not be the actual facts.'" *Kelly v. Curtis*, 21 F.3d 1544, 1546 (11th Cir. 1994)(quoting *Swint v. City of Wadley*, 5 F.3d 1435, 1439 (11th Cir. 1993), *modified*, 11 F.3d 1030 (11th Cir. 1994), *judgment vacated on other grounds* 514 U.S. 35 (1995)).

3

In April 2000, insurance company Blue Cross and Blue Shield of Alabama ["BCBS"] implemented new restrictions on its reimbursement to providers of physical therapy services, which adversely affected defendant's revenue. (*Id.* at 32-33; Ex. B at 90.) Specifically BCBS limited the reimbursable charge for therapeutic exercises, which affected defendant's ability to seek reimbursement for the services of athletic trainers, exercise physiologists, physical therapy technicians, and physical therapy aids. (*Id.*, Ex. A at 32-33; Ex. B at 90-91.) BCBS also limited the number of physical therapy sessions per patient for which it would pay. (*Id.*, Ex. A at 32-33; Ex. D at 10-11.) These changes limited the number of visits to eight per patient, but BCBS later increased the number of covered sessions to fifteen per patient. (*Id.* at 12; Ex. K ¶ 3.)

Payments from BCBS comprised about 80% of defendant's revenues from insurance billings. (*Id.*, Ex. A at 26.) The BCBS changes had an immediate adverse impact on defendant's revenue, resulting in monthly losses of approximately $40,000. (*Id.*, Ex. B at 90; Ex. D at 12.) As a result of this change, most of defendant's physical therapy technicians were laid off. (*Id.*, Ex. K ¶ 4.)

In July 2000, defendant did not have adequate funds to pay its payroll taxes. (*Id.*, Ex. D at 14; Ex. J at 12-13.) On or about July 14, 2000, SouthTrust loaned defendant $56,000. (*Id.*, Ex. C at 35-37; Ex. H at 12.) Thereafter, defendant regularly had difficulty meeting its payroll, and Ms. Noble requested additional funds from SouthTrust about every two weeks. (*Id.*, Ex. B at 183-84; Ex. H at 19-20.)

In August 2000, plaintiff's salary was raised to $35,000 per year. (Doc. 25, Ex. B at 1.) This was a $12,000 increase in less than three years and the increase was based on plaintiff's job performance, productivity, increased responsibilities, and her value to defendant. (*Id.*)

In December 2000, Abbott told the Nobles that they needed to consider reducing defendant's expenses. (Doc. 23, Ex. H at 11, 16-17.) The Nobles and Williams proposed talking a 15% cut in their pay in 2001. (*Id.*, Ex. B at 38-39, Ex. C at 32-35 and exs. 32 and 41; Ex. D at 8; Ex. H at 16-17, 19-21.) However, the 15% pay cut was not sufficient to allow defendant to meet its current cash flow needs, and further reductions in defendant's expenses were required. (*Id.*, Ex. H at 20-21.)

During this time, the Nobles and Williams discussed eliminating certain positions as a way to reduce expenses. In December 2000, they identified four positions for elimination: (1) Clinic Director, a position held by Bethel Bradford; (2) Certified Athletic Trainer, a position held by Shea Richardson; (3) Marketing Director, a position held by Bob Labbe; and (4) Insurance Collection Clerk, a position held by plaintiff. (Doc. 23, Ex. B at 36, 57, 58-59, 60-64.) At this time, plaintiff was not pregnant. (*Id.* at 76; Ex. A at 38.)

Williams described the determination of the positions to be eliminated as follows:

> Q. At some point did you have any discussions with anybody about making any cutbacks of employment?
>
> A. Several times.
>
> Q. Tell me the first discussion you had about that and with whom.

A. Well, Mark and Teresa and I talked several times in the hallway about who we could cut back. We had talked about cutting back clinical staff, and we felt like we couldn't cut back anybody who could generate revenue. So we looked at anybody that we could eliminate that was not generating revenue.

Q. What do you mean by "generating revenue"?

A. Seeing patients.

Q. When did you first have that discussion with Mark and Teresa?

A. Probably May, June of 2000, when we could see how hard we had been hit by Blue Cross.

Q. And did ya'll in fact, cut anybody back at that time?

A. No, not that I recall.

Q. When is the next time ya'll had a conversation about that?

A. We talked about it several times, but it got real serious in November, December of that year.

Q. What made you think it was more serious?

A. Well, we were continuing to lose money. We had already taken out a $56,000 loan. We were getting pressure from the doctors to pay our CAM charges in December, and we just weren't making ends meet. So in November-December we talked about it seriously.

Q. Did ya'll discuss which positions to eliminate?

A. Yes.

Q. Which positions did ya'll discuss?

A. We had talked about Bethel and Shae and Bob Labbe, that were not directly involved with physical therapy; and then Candace, who was directly involved with the physical therapy side of things.

6

> Q. Did ya'll talk about any other positions as to potentially eliminate?
>
> A. We talked about whether or not we could let some of the physical therapy assistants go, if we should try to cut back on the physical therapists, and again came to the same conclusion, that we needed to keep the people who were seeing the patients.
>
> Q. When did you have the discussion about eliminating Bethel Bradford's, Shae Richardson's, Bob Labbe, and Candace Plank's positions?
>
> A. November-December, before Christmas.
>
> Q. Who was present during that discussion?
>
> A. I remember discussing it with Teresa because I was concerned that they would lose their jobs before Christmas.
>
> Q. You expressed that concern to her?
>
> A. Yes.
>
> Q. And did she have a response?
>
> A. She didn't want to either. We decided we could see if we could make it through the first quarter of next year.

(Doc. 23, Ex. D at 13-15) Williams also testified that he had suggested eliminating plaintiff's position because "she was paid for a 40-hour week and didn't have that much work to do." (*Id.* at 29.) Mr. Noble testified that plaintiff was selected for termination because:

> She filed insurance for reimbursements, and we had begun filing insurance electronically, so there wasn't much for her to do. She had a high salary, and she did not multi-task. For example, she couldn't work the front desk, and had stated that she would not work the front desk. So there was limited work for her to do, and she had a high salary.

(Doc. 23, Ex. E at 20.)

The Nobles and Williams decided not to tell Bradford, Richardson, Labbe, and plaintiff that their positions were to be eliminated until the end of the first quarter, the end of March, because the Nobles and Williams "didn't want to fire anybody." (*Id.* at 19-20.) Mr. Nobles also testified, "[W]e wanted to see if there was a way to save the positions, could we find responsibilities, some money-making potential, was there any way we could make if work out for them." (*Id.* at 20.) However, before Christmas of 2000, Ms. Noble did tell Charles William ("Charley") Davidson, defendant's Head Athletic Trainer, that she, Mr. Noble, and Williams had decided to eliminate the four positions to reduce expenses. (*Id.*, Ex. K ¶ 5.)

On January 26, 2001, defendant sent plaintiff to a physical therapy conference in Birmingham, Alabama. (*Id.*, Ex. B at 2.) From December 2000 to February 2001, plaintiff received at least three encouraging calls from Ms. Noble. (*Id.*) During those calls, Ms. Noble told plaintiff that there were a lot of changes in the not-so-distant future and that these changes would make plaintiff "very happy." (*Id.*) The last time plaintiff received such an encouraging call was around the end of February 2001. (*Id.*)

On or about March 12, 2001, plaintiff told Ms. Noble she was pregnant. (*Id.*, Ex. A at 75-76.) Shortly before that plaintiff received a call from a co-worker, telling her that Noble was very upset when she found out that plaintiff was pregnant and that plaintiff had not told Noble. (*Id.* at 76.) Allegedly, upon being told that plaintiff was pregnant, Ms. Noble said, "[W]hat is she going to do; why has she not told me." (*Id.* at 77.) Plaintiff went to Ms. Noble's office on March 12, 2001, to speak with her. (*Id.* at 76.) When plaintiff told Ms.

8

Noble about the pregnancy, Ms. Noble asked her, "How are you going to work and have a baby?", and "[W]hat if there is more than one."[2] (*Id.* at 80-81.) Ms. Noble also said, "You are not going to be able to work and take care of a baby. (*Id.* at 82.) Plaintiff told Ms. Noble that she would only take two weeks of maternity leave and then she would come back to work half days at first. (*Id.* at 83.)

Around the time plaintiff told Ms. Noble she was pregnant, Teri Davidson, Ms. Noble's friend and defendant's employee, told plaintiff that, when she had talked to Ms. Noble about plaintiff's pregnancy, Ms. Noble was angry and felt that plaintiff was trying to pull something over on her. (*Id.* at 90.)

Defendant's financial condition did not improve during the first quarter of 2001. (Doc. 23, Ex. D at 28-29; Ex. B at 37.) By the end of March 2001, insurance collections were down an additional $50,000 from March of 2000. (*Id.* Ex. B, ex. 34.) Accordingly, the Nobles and Williams decided to implement the planned elimination of four positions. (*Id.* Ex. B at 37; Ex. D at 28-29.)

On April 2, 2001, Ms. Noble told Labbe and plaintiff that their positions were being eliminated due to financial reasons. (*Id.* Ex. A at 98-99, 153-54; Ex. B at 66-68, 216.) Ms. Noble told plaintiff and Labbe that they would be paid through the end of the month, but their attendance at work was not required. (*Id.* Ex. A at 101; Ex. B at 68.) Ms. Noble told plaintiff that her job duties were going to be absorbed by Terry Utley until August, when

---

[2]Plaintiff had received fertility treatments. (Doc. 23, Ex. A at 59-60.)

9

defendant planned to out-source its billing.³ (*Id*. Ex. A at 102.) Ms. Noble told plaintiff that it would be better for her to be terminated now, rather than in August, because "by August, [she] would be great, big pregnant and no one would hire [her]."⁴ (Doc. 23, Ex. A at 99-100.) Ms. Noble told plaintiff that she was really doing her a favor because potential employers would not be able to tell that she was pregnant and plaintiff certainly did not need to tell them. (*Id*.)

Plaintiff expressed concern about not having insurance coverage, and defendant agree to provide her health insurance until the end of 2001, which covered the delivery of plaintiff's baby. (*Id*. at 121-22, 125-26; Ex. B at 67, 112, and ex. 10.)

After plaintiff's termination, her job duties were assumed by Terry Utley, who worked in the front office and had some prior insurance billing and collections experience. (Doc. 23, Ex. B at 60-65; Ex. F at 11-13, 18-19.) Utley's salary at that time was $20,000-21,000; she did not receive a raise when she assumed plaintiff's duties. (Doc. 23, Ex. B at 69, 113; Ex. F at 25-27.) Plaintiff contends that a receptionist was hired to replace Utley when she assumed her job duties. However, this contention is not supported by the evidence. (*See* doc. 36, Ex. 1 ¶¶ 3-4.)

---

³Defendant did not out-source its insurance billing in August 2001, allegedly because it decided to sell the physical therapy portion of its business to HealthSouth. (Def. Br. in Supp. of Mot. for Summ. J. at 6.)

⁴Ms. Nobel denies that she made this statement or any similar statement to plaintiff. (Doc. 23, Ex. A at 201-02.) However, plaintiff's testimony that Ms. Noble did make such a statement is accepted as true for purposes of this motion.

In June 2001, defendant closed its fitness center and many of those employees were terminated. (Doc. 23, Ex. B at 150.) In November 2001, defendant sold its physical therapy business to HealthSouth. (*Id.* at 129 and ex. 14.)

### III. DISCUSSION

#### A. PREGNANCY DISCRIMINATION

Plaintiff claims that defendant terminated her in violation of the Pregnancy Discrimination Act ("PDA"), which provides:

> The terms "because of sex" or "on the basis of sex" [as used in Title VII] include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k). In this circuit, "[t]he analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits." *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000).

#### 1. Direct Evidence

Plaintiff contends that defendant's Motion for Summary Judgment is due to be denied because she has presented direct evidence of pregnancy discrimination. Specifically, she argues:

> Teresa Noble was the person who made the decision to terminate Plaintiff. When she learned of Plaintiff's pregnancy, Noble said, "How are you going to work and have a baby." Three weeks later, on the day Plaintiff was terminated, Noble told Plaintiff that she was doing her a favor by terminating Plaintiff now instead of in August when she would be "great big pregnant" and no one would hire her. These comments where made by the decision-maker

11

about the decision making process. A reasonable interpretation of the comment is that more probably than not, Plaintiff was being unlawfully terminated because of her pregnancy.

(Pl. Br. in Opp. to Mot. for Summ. J. at 11-12.) The court finds that these statements are not direct evidence that defendant terminated plaintiff because she was pregnant.

"Direct evidence of discrimination is evidence, that, if believed, proves the existence of a fact without inference or presumption." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999)(internal quotations omitted); *cited in Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002.). "Direct evidence is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor. If an alleged statement . . . merely suggests a discriminatory motive, then it is by definition only circumstantial evidence." *Schoenfeld*, 168 F.3d at 1266 (internal citations and quotations omitted).

Ms. Noble's query regarding plaintiff's ability to work after she had her baby and her comment on the fortuitous timing of the termination decision are not "blatant remarks" that prove – without inference or presumption – that Noble fired plaintiff *because* she was pregnant. Therefore, the court finds that Noble's statements are not direct evidence that she terminated plaintiff because she was pregnant.

### 2. Circumstantial Evidence

Because plaintiff does have direct evidence of discrimination, the court will consider whether the record contains sufficient circumstantial evidence of discrimination to defeat defendant's Motion for Summary Judgment.

Generally, to demonstrate a prima facie case of discrimination with regard to termination, plaintiff must show: "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated [non-pregnant] employees more favorably; and (4) she was qualified to do the job." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Once plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the employment action at issue. If the employer articulates such a reason for its decision, the burden shifts back to plaintiff to produce evidence "including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997), *cert. denied sub nom.*, *Combs v. Meadowcraft Co.*, 522 U.S. 1045 (1998).

Plaintiff may establish a prima facie case by showing (1) that she was pregnant, (2) that she was terminated, (3) that she was qualified for her job, and (4) that her she was replaced by a non-pregnant employee. *See Chapman v. AI Transport*, 229 F.3d 1012, 1024 (citing *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207-08 (11th Cir. 1997)). Plaintiff has presented evidence that she was pregnant, that she was qualified for her position, that her position was eliminated, and that her job duties were assumed by a non-pregnant employee, Utley. This evidence is sufficient to establish plaintiff's prima facie case of discrimination. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 982 (11th Cir. 1989)(citing *Rollins v. Techsouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir.1987), *cert. denied* 495 U.S. 935 (1990).

Because the court finds that plaintiff has established a prima facie case of pregnancy discrimination, the burden shift to defendant to articulate a legitimate, non-discriminatory reason for plaintiff's termination. *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060 (11th Cir. 1994). "This intermediate burden is 'exceedingly light. The employer need only offer admissible evidence sufficient to raise a genuine issue of fact as to whether it had a legitimate reason for [terminating] the plaintiff." *Id.* (citation and internal quotations omitted). "[A]lthough it is true that the employer need not prove it was actually motivated by the proffered reason, [the employer must] produc[e] a reason that was available to it at the time of the decision's making. Moreover, [the Eleventh Circuit] has squarely held that an employer may not satisfy its burden of production by offering a justification which the employer either did not know or did not consider at the time the decision was made" *Id.* (citations omitted).

Defendant contends that plaintiff was terminated because her position was eliminated due to defendant's adverse financial condition. Defendant contends, specifically, that changes in the BCBS's reimbursements caused defendant to lose money and that Williams and the Nobles decided to eliminate plaintiff's position, as well as three other positions, in an effort to reduce expenses. The decision to eliminate these four positions was made in December 2000, before plaintiff became pregnant, but defendant did not act to eliminate the positions until April 2001 because it hoped the financial conditions would improve and the

terminations would not be necessary.[5] Plaintiff's position was chosen for elimination because it was not a revenue-generating position, her salary was relatively high compared to other employees, and her job duties could be absorbed by another, lower-paid employee. These reasons satisfy defendant's burden to articulate a legitimate, non-discriminatory reason for the challenged employment decision; therefore, the burden shifts back to plaintiff to establish that defendant's articulated reason is a pretext.

*Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000)(quoting *Combs*, 106 F.3d at 1528-29)(internal citations and quotations omitted).

Plaintiff may establish that an articulated reason is a pretext for pregnancy discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989)(quoting *Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1445 (11th Cir. 1985)(citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)), *cert. denied* 474 U.S. 1005 (1985)). If a plaintiff chooses to establish pretext by showing that his employer's proffered reason is unworthy of credence, she must attack that reason "head on

---

[5]Obviously, defendant could not have discriminated against plaintiff based on her pregnancy before the decision-makers knew he was pregnant. *See Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d 1301, 1305-06 (11th Cir. 2002)("Accordingly, an employer cannot intentionally discriminate against an individual based on his religion unless the employer knows the individual's religion." (citing, *inter alia, Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005-07 (7th Cir. 2001)(Pregnancy Discrimination Act claim); *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 580-82 (3d Cir. 1996)(same))), *cert. denied* 123 S. Ct. 872 (2003).

and rebut it." *Chapman*, 229 F.3d at 1030. The plaintiff must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538(quoting *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1005-06 (7th Cir. 2001)("Pretext means a dishonest explanation, a lie rather than an oddity or an error. A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks. On the issue of pretext, our only concern is the honesty of the employer's explanation. Thus, even if [defendant's] reasons for [plaintiff's] termination were mistaken, ill considered or foolish, so long as [defendant] honestly believed those reasons, pretext has not been shown.")(internal citations and quotations omitted.)

Plaintiff's evidence is not sufficient to establish that defendant's articulated reasons are a pretext for pregnancy discrimination. Plaintiff argues that defendant's articulated reasons are pretext for pregnancy discrimination because she was not told her position was to be eliminated until after she told Ms. Noble she was pregnant, because defendant sent her to a seminar after it had allegedly decided to eliminate her position, because Ms. Noble told her that defendant was about to make some changes that would make her "happy," because defendant did not begin to use a billing service in August, because Ms. Noble told plaintiff that it was a good thing that she terminated her in April (instead of August) because plaintiff would have a more difficult time getting a job in August when she would be "great big

16

pregnant," and because two of the employees defendant alleges it terminated were never told that their jobs were eliminated. Plaintiff does not dispute that changes in BCBS reimbursements significantly decreased defendant's revenue or that her job duties were assumed by an existing employee, Utley, who continued to perform additional front office job duties. Moreover, she has presented no evidence to dispute the fact that the Nobles and Williams decided in December 2000, before plaintiff was pregnant, to eliminate her position. *See Lubetsky*, 296 F.3d at 1305-06.

Moreover, the evidence is undisputed that the four positions allegedly identified by the Nobles and Williams for elimination after the first quarter of 2001 were actually eliminated. The salaries of Bradford, Richardson, Labbe, and plaintiff were relatively high in comparison to other employees. Labbe and plaintiff were not in revenue-generating positions. Plaintiff and Labbe, a male, were treated identically, with the exception of the fact that defendant provided plaintiff with medical insurance for eight months following her termination.

Also, the court finds that the comments of Ms. Nobles do not demonstrate that the articulated reason for plaintiff's termination was a pretext. The statement – "how are you going to work and have a baby" – is simply too ambiguous to indicate a bias. The statement about terminating plaintiff before she got "great big pregnant" was clearly made after the decision to terminate plaintiff had been made and was said in the context of plaintiff getting another job, not as a reason for her termination. As set forth above, plaintiff's termination was inevitable following the decision in December 2000 to eliminate four jobs to reduce

17

expenses unless defendant's financial condition improved. Ms. Noble's statement regarding her belief that the "timing" of that termination would facilitate plaintiff's search for other work is not evidence from which a reasonable jury could infer that the decision to terminate plaintiff was based on plaintiff's pregnancy.

For the reasons set forth above, the court finds plaintiff has not established that defendant's articulated reason for its decision to eliminate her position was a pretext for unlawful discrimination based on plaintiff's pregnancy. Therefore, defendant's Motion to Summary Judgment as to plaintiff's pregnancy discrimination claim will be granted.

**B. INVASION OF PRIVACY AND BREACH OF CONTRACT**

Plaintiff does not oppose defendant's Motion for Summary Judgment as to her state law claims of invasion of privacy and breach of contract. Therefore, defendant's Motion for Summary Judgment will be granted, without opposition, as to plaintiff's state law claims.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this _29th_ day of March, 2004.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
United States District Judge